**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

               Plaintiff,

v.

$105,180 in United States Currency,

               Defendant.

No. CV-12-08122-PCT-DGC

**ORDER**

The United States moves for summary judgment in this currency forfeiture action. Doc. 12.  Claimants Gerardo Cardenas and Leonel G. Cardenas have filed a response in opposition, and the government has filed a reply.  Docs. 20, 21.  The parties have not sought oral argument.  For the reasons that follow, the Court will grant the government's motion.

**I.**    **Background.**

The following summary is based on the moving party's largely undisputed statement of facts.  Wherever the Court cites to disputed facts, it will note the dispute and cite to Claimants' version of the facts.

    **A.**    **Currency Seizure.**

On September 16, 2011, Claimant Gerardo Cardenas ("G. Cardenas" or "Cardenas") was pulled over on the west-bound side of Interstate 40 near Houk, Arizona, by Navajo Department of Public Safety Officer Calvin Brown.  Doc. 13, ¶¶ 6-15.  Officer Brown had observed Cardenas driving a silver Toyota sedan bearing a California license plate, later identified as being registered to Hertz Vehicles LLC., and weaving between

the white shoulder line and the center line.  *Id.*, ¶ 6.  After following Cardenas's vehicle for approximately 1/2 mile, Officer Brown pulled alongside the vehicle, travelling 75 miles per hour, and noted that Cardenas's posture was rigid and he continued to stare straight ahead, behavior not typical of the normal motoring public.  *Id.*, ¶¶ 8-10.  Officer Brown then activated his emergency lights and made the stop.  *Id.*, ¶ 11.

When Officer Brown greeted Cardenas and explained his reason for the stop, Cardenas was yawning and sighing loudly and stated that he was tired.  *Id.*, ¶ 15. Cardenas produced a California driver's license and a vehicle rental agreement confirming his identity as Gerardo Cardenas.  *Id.*, ¶¶ 15-16.  In addition to Cardenas, there was a small child in the front passenger seat whom Cardenas identified as his stepson.  *Id.*, ¶¶ 13, 23.

When Cardenas handed Officer Brown his documentation, Officer Brown noted that Cardenas's right hand was shaking.  *Id.*, ¶ 17.  Officer Brown told Cardenas that he intended to give him a written warning and asked him to meet him at his patrol car.  *Id.*, ¶ 18.  He noted that Cardenas was inhaling deeply and exhaling loudly in an apparent attempt to lessen his nervousness through controlled breathing, that his body was shaking, and that his level of nervousness continued to increase.  *Id.*, ¶ 19; *see* Doc. 14 at 5, ¶ 13.  When Officer Brown asked Cardenas if he was all right and suggested he relax because he was receiving only a warning, Cardenas said he was tired.  *Id.*, ¶¶ 20-21.

While Officer Brown prepared the written warning, he asked Cardenas where he was travelling.  Cardenas said he was returning home to California after visiting relatives in Albuquerque, New Mexico.  *Id.*, ¶ 22.  When Officer Brown asked if he had a good trip, Cardenas said he had visited a friend, but only for one day, and he didn't have time to do much.  *Id.*, ¶ 24.  Officer Brown asked Cardenas why he had made the drive for only a one-day visit, and Cardenas answered that he did not like to fly.  *Id.*, ¶ 25.  He also said that he had brought his stepson along for company, and, when asked about the boy's mother, said she was working.  *Id.*, ¶¶ 25-26.  When Officer Brown asked Cardenas if he was employed, he said no.  *Id.*, ¶ 26.  When asked about where in Albuquerque he had

visited, Cardenas was vague and stated he thought it was Coors Road. *Id.*, ¶ 27.

After Officer Brown completed the warning and explained it to Cardenas, Cardenas said he understood and signed it. *Id.*, ¶ 29. Officer Brown then asked if he could ask a few more questions. *Id.*, ¶ 30. Based on his training and experience, Officer Brown had noted several indicators that caused him to suspect that Cardenas was involved in criminal activity, including his driving behavior, excessive nervousness, labored breathing, vague responses, implausible travel story, unemployment, use of a rental car, and travel between Ukiah, California – a source location for marijuana – and Albuquerque, New Mexico – a demand location. *Id.*, ¶ 31; *see* Doc. 14 at 6, ¶ 26.

Officer Brown explained his duties as a K-9 officer and asked if there were any drugs in the vehicle. Cardenas said no. *Id.*, ¶¶ 32-33. Officer Brown informed Cardenas that the Ukiah, California area is a known source for marijuana and asked if Cardenas had delivered a load of marijuana to New Mexico. Cardenas said no. *Id.*, ¶¶ 34-35. When asked if there were any large sums of money in the vehicle, Cardenas took a deep breath, exhaled loudly, looked toward the vehicle and said "not that I know of." *Id.*, ¶ 36. When asked what he meant, Cardenas explained, "if there is money in there, I don't know anything about it." *Id.*, ¶ 37. Officer Brown asked if he could search the vehicle, and Cardenas consented. *Id.*, ¶ 38. When asked if he was responsible for everything inside the vehicle, Cardenas answered yes. *Id.*

Upon searching the vehicle, Officer Brown found a blue suitcase and a blue "Thomas the Train" child's backpack in the backseat. *Id.*, ¶¶ 44, 47; *see* Doc. 14 at 7-8, ¶¶ 39, 44. Officer Brown searched the suitcase and founds men's clothing and hygiene items as well as a white plastic shopping bag containing an assortment of polo shirts. *Id.*, ¶¶ 44, 45. Officer Brown felt a bulge inside one of the polo shirts at the bottom of the bag and, upon unfolding it, discovered a bundle of currency, which he returned to the bag and suitcase. *Id.*, ¶¶ 45-46. Officer Brown, observed by a second officer, Officer Peshlakai, then searched the child's backpack and discovered some clothing and, located at the bottom, a plastic Wal-Mart bag. *Id.*, ¶ 47. Officer Brown opened the bag, saw that

it contained ten bundles of currency, two of which were wrapped in aluminum foil, and returned the bag to the backpack. *Id.*, ¶ 48. Officer Brown then placed the blue suitcase and backpack on the ground and retrieved his certified narcotic detection canine Remo from the patrol car to walk around the area. *Id.*, ¶ 49. Remo, who is trained to alert to the odors of marijuana, cocaine, heroin, and methamphetamine, suddenly moved toward the backpack, sniffed, and began scratching at the backpack, indicating a positive alert to one of these substances. *Id.*, ¶¶ 49-50. Remo also indicated a positive alert to the blue suitcase. *Id.*, ¶ 51. Officer Brown informed Cardenas of this and asked if the money was drug proceeds. Cardenas said it was his savings from his business. *Id.*, ¶¶ 52-53. When asked if he had ever been arrested, Cardenas answered that he had served six years in prison for manufacturing methamphetamine. *Id.*, ¶ 56.

Officer Brown informed Cardenas that he was going to seize the currency and advised him that he would be given a notice of the seizure with instructions on how to submit a claim if he was the owner, or, if he was not the owner, he could sign a Disclaimer of Ownership form. *Id.*, ¶¶ 58-60. Cardenas told Officer Brown that he just wanted to be on his way and did not want further attention from the court system. *Id.*, ¶ 61. What happened next is partially in dispute. The government asserts that Officer Brown did not pressure Cardenas to sign the Disclaimer of Ownership form; that he asked Cardenas to read it carefully, Cardenas read the form aloud, stated he understood, and signed the form. *Id.*, ¶¶ 62-64. Claimants agree that Cardenas signed the Disclaimer, but say this was because Officer Brown told him if he did so he would not be arrested and could go, and he was concerned about what would happen to his stepson if he was arrested. Doc. 20-1, ¶¶ 61-64. The copy of the Disclaimer attached to the government's motion shows both that Cardenas signed the form, attesting, in relevant part, that "I hereby state that I am not the owner of this currency or property, I have no legal interest in it, and I make no claim for the return of the currency or property to me," and, where the form allows for identification of the owner, that he listed himself as the owner from "buying and selling cars." Doc. 17 at 2.

After Cardenas executed the Disclaimer, he followed Officer Brown to the Port of Entry in Sanders, Arizona, to receive a copy.  Doc. 13, ¶ 65.  Cardenas asked Officer Brown if he could have $300 from the currency because he had no other money to get back to California.  Doc. 13, ¶ 66.  Officer Brown agreed because Cardenas was travelling with a small child, and he counted out $300 in the presence of Officer Peshlakai and gave it to Cardenas after Cardenas amended the amount seized written on the form.  *Id.*, ¶¶ 66-67; *see* Doc. 14 at 10, ¶¶ 71-72.

What Cardenas said to the officers about the currency at this time is in dispute. The government points to the affidavits of Officers Brown and Peshkalai that Cardenas told them at the Port of Entry that the money in the blue suitcase was his "cut" of $5,000 for transporting the currency, and that the remaining amount should equal $100,000. Doc. 13, ¶¶ 71-73; *see* Doc. 14 at 10, ¶¶ 68-69; 16, ¶¶ 40-41.  When asked again if the currency was drug money, Cardenas said yes.  *Id.* at 10, ¶ 70; 16, ¶ 42.  Claimants deny that Cardenas made these statements and point to Cardenas' affidavit that he stated the money came from his savings and that he was keeping a portion of it separated for travelling expenses.  Doc. 20-1, ¶¶ 71-73; *see* Doc. 20-2, ¶ 17.[1]  Cardenas also attests that he told the officer that he intended to buy and sell cars.  *Id.*

On April 4, 2012, Claimants submitted a claim to the Federal Bureau of Investigation ("FBI") that they are joint owners of the seized currency.  Doc. 13, ¶ 80. Claimant Leonel G. Cardenas ("L. Cardenas"), the father of Claimant G. Cardenas, asserted that $80,000 of the *res* belonged to him based on a loan he made to his son in that amount prior to the seizure.  *Id.*, ¶ 82.  The remaining $25,180, according to a statement from Claimants' attorney, represents the savings G. Cardenas had put aside from prior earnings while living with his parents.  *Id.*, ¶ 81; *see* Doc. 17 at 4.

**B.    Cardenas's Past Drug Arrest and Relevant Financial Activity.**

In April of 2002, Claimant G. Cardenas was arrested on drug charges.  Doc. 13,

---

[1] G. Cardenas's affidavit contains two paragraph 17's.  Unless otherwise noted, where the Court references paragraph 17, it is to the first.

- 5 -

¶ 78.  Cardenas plead guilty to Manufacture of a Controlled Substance with Excess Amount while Armed with a Firearm, and was sentenced to 11 years in prison.  *Id.*, ¶ 79.  After release from prison, Cardenas worked at Ken Fowler Motors in Ukiah, California, from March 31, 2009, to March 11, 2011.  Doc. 20-1, ¶ 76; *see* Doc. 20-2 at 14-15.

Cardenas's employment income is in dispute.  The government avers that an all-state search of the Arizona Department of Economic Security ("DES") database using the social security number Cardenas provided revealed no income from June 1, 2010, to June 4, 2012.  Doc. 13 at 76.  As evidence, the government points to the affidavits of FBI Special Agent Perryn Collier and United States Marshals Service ("USMS") Senior Inspector Dennis Harkins stating that they were aware that a search rendering these results had been conducted, but the government provides no information about who conducted the search or where the information concerning the results came from.  *See* Docs. 14 at 19, ¶ 6; 17 at 11, ¶ 11.  Claimants dispute that Cardenas made no income during this period and cite to his affidavit that he was employed by Ken Fowler Motors from March 31, 2009, to March 11, 2011, and was laid off due to downsizing because of economic concerns.  Doc. 20 at 5, ¶ 4; *see* Doc. 20-2 at 3, ¶ 3.  They also point to the affidavit of a contract clerk with Ken Fowler Motors affirming Cardenas's employment, but Claimants provide no evidence of any income he received.  Doc. 20-2 at 14-15.  The parties do not dispute that Cardenas began receiving unemployment insurance of $165 to $220 per week based on his prior employment with Ken Fowler Motors from January 28, 2012, to at least June 4, 2012.  Doc. 13, ¶ 77.

Cardenas has access to two bank accounts with Bank of America in Ukiah, California, an account in his own name which he opened at the Ukiah Banking Center on May 12, 2011, and a joint account with Maribel V. Espitia, opened at the same banking center on April 27, 2010.  Docs. 13, ¶¶ 84-85; 20-1, ¶ 85; 21 at 4, ¶ 2.  From June 1, 2010, to July 8, 2011, deposits to these accounts totaled $58,191, with $49,984, or 86%, coming from cash deposits.  Doc. 13, ¶¶ 86-88.  Fifty-eight cash withdrawals made over the same period totaled $57,160.75, representing 93% of total withdrawals.  *Id.*, ¶¶ 89-90.

Of these, 34 withdrawals, representing a total of $48,269, occurred immediately after deposits had been made.  *Id.*, ¶ 90.  These transactions were conducted at a number of banking centers in Tennessee and California, including the Ukiah Banking Center in Ukiah, California.  *Id.*, ¶ 91.

## II.    Legal Standards.

### A.    Summary Judgment.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment – the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.    Civil Forfeiture Standards.

"Summary judgment procedures must necessarily be construed in light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein."  *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 979 (9th Cir. 2002).

#### 1.    The Government's Burden of Proof Regarding Forfeiture.

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]"  18 U.S.C. § 983(c)(1); *see United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002) ("CAFRA transferred

the burden of proof from the Claimants to the government and required the government to establish forfeiture by a preponderance of the evidence rather than by the lower probable cause standard[.]").  "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

### 2.       The Claimants Burden of Proof.

If the government meets its burden of proof regarding forfeiture, the burden shifts to the Claimants to prove, by a preponderance of the evidence, that the currency was not connected with illegal activity.  *Currency, U.S. $42,500.00*, 283 F.3d at 980.  "'A 'claimant' is one who claims to own the article or merchandise or to have an interest therein.'"  *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983) (quoting *United States v. $15,500.00 in U.S. Currency*, 558 F.2d, 1359, 1360 (9th Cir. 1977), and citing *United States v. One 56-Foot Motor Yacht Named Tahuna*, 702 F.2d 1276, 1279 (9th Cir. 1983)).  Possession of currency at the time of seizure "coupled with a claim of ownership" is sufficient to establish standing to challenge forfeiture at the summary judgment stage.  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 639 (9th Cir. 2012).

To defeat a civil forfeiture action, a claimant must "show by a preponderance of the evidence that the property was not involved in a violation of the narcotics laws, or [] otherwise refute the government's showing[.]"  *United States v. $215,300 in U.S. Currency*, 882 F.2d 417, 419 (9th Cir. 1989); *see also One 56-Foot Motor Yacht Named Tahuna*, 702 F.2d at 1281 (a claimant may defeat forfeiture in one of two ways, either by refuting the government's evidence, or by producing affirmative evidence that the property seized was not used or intended to be used for illegal purposes).

CAFRA also contains an "innocent owner" defense.  *See* 18 U.S.C. § 983(d). Under this defense, the claimant has the burden of showing he is an innocent owner by a

preponderance of the evidence.  *Id.*  An "innocent owner" is one who "did not know of the conduct giving rise to forfeiture," or "upon learning of the conduct giving rise to forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  *Id.* at § 983(d)(2)(A)(i)-(ii).  *See United States v. 493,850 in U.S. Currency*, 518 F.3d 1159, 1170 (9th Cir. 2008) (citing standard).

## III.   Discussion.

### A.   Standing Issues.

L. Cardenas and G. Cardenas filed a verified claim as "co-owners" of the seized currency.  Doc. 10.  Although the claim does not specify, G. Cardenas appears to assert co-ownership of only $80,000 of the total *res* based on a loan for that amount he purportedly made to his son prior to the seizure, and, in the event the money is found to be connected to illegal activity, to assert an "innocent owner defense" for the same. Docs. 10 at 1-2; 20 at 7-8, 11.  Claimants have presented evidence in the form of an affidavit and a copy of a promissory note dated August 12, 2011, but notarized three days after the seizure on September 19, 2011, that L. Cardenas loaned this amount to his son for the purpose of buying used vehicles in return for a promise to pay back the principle plus 50% of the profit from any car sales.  Doc. 20 at 7-8; *see* Docs. 20-2 at 6, ¶ 19 and 11, ¶¶ 5-6; 17 at 6-7.

The government argues that L. Cardenas does not have standing to make a claim to $80,000 of the *res* because only someone with a possessory or ownership interest in the currency has standing to make a claim, and L. Cardenas was not in possession of those funds at the time of seizure, and, under 18 U.S.C. § 983(d)(6)(B)(i), which governs the "innocent owner defense," an owner does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another."  Doc. 12 at 9 (quoting 18 U.S.C. § 983(d)(6)(B)(i)).  Doc. 12 at 9.

Claimants argue on the basis of *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 528 (2d Cir. 1999), that to have standing to make a civil forfeiture claim, a claimant must only show that forfeiture would result in a "substantial economic loss."  Doc. 20

at 8. *Cambio* stands for the general proposition that although "ownership or possession of property may provide evidence of standing . . . it is *injury* that is at the heart of the standing question." 166 F.3d at 527. This is consistent with the statutory language of CAFRA that does not limit claimants to owners or possessors, but requires the government to give notice "to interested parties" who may then make a claim by stating their "interest" in the seized property. 18 U.S.C. §§ 983(a)(1)(A)(i) & (a)(2)(C)(ii). Ninth Circuit case law also states that having a "colorable interest" in property for the purpose of making a forfeiture claim "includes [not requires] an ownership interest or a possessory interest." *$133,420 in U.S. Currency*, 672 F.3d at 637 (internal citations omitted).

*Cambio* and other cases in which courts have found persons to have standing to make civil forfeiture claims even without actual possession or title ownership are not helpful to L. Cardenas. *See* Doc. 20 at 8, 8, nn. 4-6 (citing cases finding standing under CAFRA on the basis of resulting trusts, dower interests, etc.). If anything, the promissory note proffered here is evidence that L. Cardenas gave up his ownership interest in those funds in exchange for a right to repayment and potential earnings as set forth in the note. Although as the purported lender of $80,000 to his son, L. Cardenas would have an interest in his son's ability to pay back the principle and the agreed-upon portion of profits from this investment, Claimants cite no forfeiture cases in which a creditor of the person from whom currency is seized has been found to have standing as a co-owner of that currency, and the clear statement of 18 U.S.C. § 983(d)(6)(B)(i) precluding "innocent owner" claims on this basis persuades the Court that L. Cardenas does not have standing.

The government additionally argues that G. Cardenas does not have standing to challenge the seizure of $80,000 of the *res* because he subsequently identified that portion as belonging to his father on the basis of the promissory note and was therefore no more than a bailee or nominee of the true owner. Doc. 12 at 8-9. The government cannot have it both ways – it cannot argue that the promissory note grants L. Cardenas no

ownership interest in the $80,000, and at the same time argue that G. Cardenas somehow loses his standing because he believes the note has that effect.  G. Cardenas has standing as the possessor of the funds to assert a claim to the full amount listed on the verified claim.  *See* Doc. 10 at 1.

**B.    The Government's Burden.**

To determine whether the government has met its burden of showing that the seized currency was more likely than not substantially connected to illegal activity, the Court must look to the totality of the circumstances.  *See Currency, U.S. $42,500.00*, 283 F.3d at 980 (the determination is based on the aggregate of facts, including circumstantial facts).  The government may include evidence gathered after the filing of the forfeiture complaint.  18 U.S.C. § 983(c)(2).

The government points to a number of factors, discussed below, that it argues show that the currency seized was furnished or intended to be furnished by a person in exchange for a controlled substance in violation of the Controlled Substances Act, 21 U.S.C. § 1952, was being transported in interstate commerce in violation of 18  U.S.C. § 1952, and is therefore subject to forfeiture under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).  Doc. 12 at 10-11.

As noted above, Claimants have disputed that G. Cardenas made statements to Officers Brown and Peshlakai describing the separate $5,000 as his cut of the total currency and admitting the money was drug proceeds.  Claimants point to the affidavit of G. Cardenas stating that he did not make these statements, that the money was related to car sales, and he only kept the $5,000 separated for his travelling expenses.  Doc. 20-1, ¶¶ 71-73; *see* Doc. 20-2, ¶  17.  Claimants also argue that it is highly improbable that Cardenas made an admission to having drug money after he was told he would not be arrested, especially given that he had knowledge of the criminal justice system due to his prior criminal history and was concerned about being able to leave with his step-son.  Doc. 20 at 5.  The Court finds that Claimants have raised a genuine issue of fact as to these statements and will not consider them in evaluating the totality of the evidence put

forth.

Claimants also argue that Cardenas's signature on the Disclaimer is not relevant evidence of forfeiture because he only signed based on assurances that if he did so he would be free to go, and he included a contradictory statement that he was the owner of the money.  Doc. 20 at 4, ¶ 2.  The Court finds that the Disclaimer and the testimony Claimants put forth from Cardenas's affidavit place the meaning of the Disclaimer in genuine dispute and will not rely on this evidence as an admission that Cardenas has no lawful claim.  The Court will consider whether the remaining factors, taken as a whole, are sufficient to meet the government's burden.

### 1.      Quantity, Packaging, and Concealment of the Currency.

The government argues that $105,180 is a very large quantity of currency, not usually transported as cash in ordinary business, and is highly probative of illegal activity.  Doc. 12 at 12.  The bundling of the currency in rubber bands, its placement in aluminum foil and plastic bags, and its concealment underneath clothing inside a suitcase and a child's backpack also suggest ways of packaging drug currency and attempting to defeat canine detection, not ways of carrying money for legitimate commerce.  *Id.* at 12-13.  Also probative, the government argues, is Cardenas' initial denial of any knowledge of currency in the car when he affirmed that he was responsible for all of its contents, followed by his contradictory claim only after the money was discovered that it was connected to his business of buying and selling cars, even though he had initially stated he was unemployed and his reason for travel was to visit family or friends.  *Id.* at 12, 14.

The Court agrees that these factors are probative of illegal activity.  Although the discovery of large quantities of cash alone is not sufficient to show a connection to illegal drug activity, it can be "strong evidence that the money was furnished or intended to be furnished in return for drugs."  *United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571 (9th Cir. 1984); *see also United States v. $22,991.00, more or less, in U.S. Currency*, 227 F.Supp.2d 1220, 1232 (S.D. Ala. 2002) (carrying $22,991 in the trunk of an automobile is "highly probative, although not dispositive, circumstantial evidence" of a

1  link to illegal drug activity).

2       Additionally, travelling with large sums of cash banded by rubber bands and

3  concealed in plastic shopping bags is not consistent with legitimate business activity.  *See*

4  *United States v. $242,484,* 389, F.3d 1149, 1160-61 (11th Cir. 2004) ("A common sense

5  reality of everyday life is that legitimate businesses do not transport large quantities of

6  cash rubber-banded into bundles and stuffed into packages . . .  because there are better,

7  safer means of transporting cash if one is not trying to hide it from the authorities.").  As

8  the government argues, the use of plastic bags and aluminum foil is consistent with

9  efforts to block the odor of drugs.  Doc. 52 at 13.  *See United States v. $129, 972 in U.S.*

10 *Currency*, 129 F.3d 486, 490 (9th Cir. 1997) (linking money wrapped in dryer sheets and

11 plastic wrap with drug activity); *Currency, U.S. $42,500*, 283 F3d. at 982 (finding

12 cellophane wrapping of currency a common way to conceal the odor of drugs); *United*

13 *States v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) ("[W]e have

14 adopted the common-sense view that bundling and concealment of large amounts of

15 currency, combined with other suspicious circumstances, supports a connection between

16 money and drug trafficking.").  Cardenas's initial denial of knowledge of such a large

17 sum of money and his change in position only after it was discovered also support that he

18 had reason to hide his true financial dealings and was not in possession of such a large

19 sum of money for legitimate business reasons.

20             **2.       The Positive Canine Alerts.**

21       The government has presented evidence, undisputed by Claimants, that Officer

22 Brown's certified canine partner Remo, who is trained to detect the odor of marijuana,

23 cocaine, methamphetamine, and heroin, moved toward and began scratching at the

24 child's backpack containing the bulk of the currency – indicating a positive alert to the

25 odor of one of these substances – and also alerted to the suitcase containing the remaining

26 $5,000.  Doc. 13, ¶¶ 49-51.  These alerts provide additional evidence of a connection

27 between the seized currency and illegal drug activity.  *See $215,300 in U.S. Currency*,

28 882 F.2d at 419 (finding a positive canine alert "strong evidence" of a connection

1   between currency and illegal drug activity).

2   **3.   Inconsistent/Implausible Explanations.**

3   Cardenas's inconsistent and implausible answers regarding his travel plans and the

4   source of the money further supports a link to illegal activity.  As the government points

5   out, it is highly implausible that someone who is unemployed would go to the expense of

6   renting a car to drive all the way from Ukiah, California, to Albuquerque and back,

7   merely for a one-day visit with a friend.  *See* Doc. 12 at 14-15.  The implausibility of this

8   story is underscored by Cardenas's vagueness and uncertainty about whom he had gone

9   to visit – he first said relatives, then a friend – and where in Albuquerque he had stayed.

10  Additionally, it is implausible that Cardenas could simply have forgotten about having

11  over $105,000 in the car, especially when he later claimed to have set aside $5,000 for his

12  travel expenses and to have intended to use the rest of the money for buying used cars –

13  the legitimate business activity he only later claimed was the primary purpose of his trip.

14  *See* Doc. 20-2 at 4-5, ¶ 9.  Courts routinely find such implausible and inconsistent stories

15  probative of illegal activity.  *See United States v. $ 22,474.00 in U.S. Currency*, 246 F.3d

16  1212, 1217(9th Cir. 2001) ("Mahone's inconsistent statements about the money and his

17  reasons for being in Phoenix tended to support an inference that the money was drug-

18  related."); *$242,484.00*, 389 F.3d at 1164  (finding that evasive answers about travel,

19  though not dispositive, add to the government's showing of probable cause); *see also*

20  *United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1274 (10th Cir. 2007)

21  (finding inconsistent statements about the amount and purpose of money seized to be of

22  significant probative value); *United States v. Funds in the Amount of Thirty Thousand Six*

23  *Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 467 (7th Cir. 2005) ("All of these

24  inconsistencies are relevant in weighing whether the government has established its

25  burden justifying forfeiture.")  Cardenas' conflicting assertions of ownership on the

26  Disclaimer further demonstrate the inconsistency of his explanations as to the source and

27  use of the funds.

28

### 4. Excessive Nervousness for a Routine Traffic Stop.

Cardenas' excessive nervousness, as demonstrated by his inhaling and exhaling deeply in an apparent attempt to control his breathing, his hands and body shaking, and Officer Brown's observations that he appeared to become progressively more nervous even when told he would only receive a warning, adds to the totality of evidence suggesting that he was involved in illegal activity. *See United States v. Sokolow,* 490 U.S. 1, 3-6, 10 (1989) (holding that agents had a reasonable basis to suspect the defendant was transporting illegal drugs, when, in addition to other evidence, the defendant appeared nervous), *United States v. $159,880*, 387 F.Supp.2d 1000, 1016-17 (S.D. Iowa 2005) ("The fact that a defendant appeared nervous may constitute circumstantial evidence in combination with other evidence [in support of forfeiture]").

### 5. Prior Drug Conviction.

Cardenas's prior drug conviction provides additional evidence supporting a connection between the seized currency and illegal drug activity. *See United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1217 (9th Cir. 2001) ("Evidence of a prior drug conviction is probative of probable cause"); *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988) (claimant's prior arrests and convictions on drug charges "are circumstances demonstrating more than mere suspicion of his connection with an illegal drug transaction."). Although the above cases address the probable cause standard rather than the amended preponderance of the evidence standard, the relevancy of looking to prior drug-related activity as a factor in this analysis is clear. Here, Cardenas's previous drug conviction provides a nexus to illegal drugs that is consistent with other indications of drug-related activity, including the quantity, concealment, and bundling of the currency, Cardenas's own inconsistent statements, and the canine alerts. *See, e.g.*, *$22,474.00 in U.S. Currency*, 246 F.3d at 1217 (finding that a sophisticated dog alert, along with evidence of a prior drug conviction, provided "a nexus specifically linking the incriminating circumstances to illegal drugs."). It would also appear relevant on issues such as motive and intent. Fed. R. Ev. 404(b).

**6.      Evidence of Money Laundering.**

The government argues that the pattern of mostly cash deposits and withdrawals to and from Cardenas's bank accounts from branches on different sides of the country, often in quick succession, further supports that he was involved in illegal drug activity. Doc. 12 at 17-18.  The government points to the affidavit of FBI Special Agent Perryn Connor testifying that he analyzed the activities of Cardenas's two accounts over a period of 403 days from June 1, 2010, to July 8, 2011, and that, based on Agent Connor's experience and training, the pattern of making cash deposits in one geographic location and rapidly withdrawing them in another "is an activity often conducted by those engaged in interstate trafficking of illegal controlled substances" and "is consistent with that of a money courier for a drug trafficking criminal enterprise."  Doc. 14, ¶¶ 16-17. Claimants do not dispute the banking activity or the accuracy of these descriptions, but only dispute that the conclusions apply to Cardenas.  Doc. 20-1, ¶¶ 91-96.  Absent any contrary evidence showing that the distinctive timing and geographic remoteness of these mostly-cash transactions were related to legitimate business activity, the Court finds that this evidence further supports a connection to illegal drug activity.

**7.      Conclusion as to the Government's Burden.**

The Court finds that the above-cited factors, taken as a whole, are sufficient to show that the money seized was more likely than not connected to illegal drug activity. The primary facts supporting this connection are: (1) the more than $105,180 in cash found in a suitcase and child's backpack, (2) the money was bundled in rubber bands, wrapped (in part) in aluminum foil, and placed in plastic bags, (3) a trained drug-sniffing dog positively alerted to the backpack and suitcase, (4) Cardenas initially denied knowing of any money in the car, (5) Cardenas gave implausible and conflicting explanations for travel, (6) Cardenas was excessively nervous, (7) the prior drug conviction, and (8) the cross-country banking transactions consistent with involvement in an interstate drug enterprise.  The government has carried its burden in this case.

### C.     Claimants' Burden.

Having determined that the government has met its burden, the Court must determine whether Claimants have raised a genuine issue of material fact over the government's claim or have provided sufficient evidence to show, by a preponderance of the evidence, that the seized currency was not connected to illegal activity.

### 1.     Claimants' Response to the Government's Evidence.

Claimants do not attempt to dispute the evidence relied on above.  Instead, they assert that the Court should suppress much of this evidence because it was unlawfully obtained.  Doc. 20 at 9-11.  Claimants argue that Officer Brown unreasonably prolonged the duration of the traffic stop beyond the time it took to issue a warning citation, and he conducted an unlawful search of Cardenas's vehicle, both in violation of the Fourth Amendment.  *Id.* at 9, 10-11. [2]  The Court is not persuaded.

### a.     Unlawful Detention.

Claimants rely on a number of California state court cases and two Tenth Circuit cases for the proposition that an officer may only detain someone during a routine traffic stop for the time it takes to request a driver's license and registration, complete a computer check, and issue a citation, and the detainee should then be permitted to proceed on his way without further questioning.  Doc. 20 at 9-10; *see, e.g.*, *United States v. Walker*, 933 F.2d 812, 814-16 (10th Cir. 1991) (citing *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988)).  The Ninth Circuit has similarly held on the basis of Supreme Court precedent that a traffic stop must last no longer than necessary to effectuate its original purpose.  *United States v. Mondello*, 927 F.2d 1463, 1471 (9th Cir. 1991) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  An officer may, however, engage in questioning unrelated to the stop as long as doing so does not prolong the stop, or the questioning is supported by reasonable suspicion.  *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007).  Claimants have not shown that Officer Brown's initial

---

[2]  "The Fourth Amendment exclusionary rule applies to civil forfeiture proceedings."  *United States v. $186,416 in U.S. Currency*, 590 F.3d 942, 949 (9th Cir. 2010) (citing *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965)).

questions to Cardenas about his trip prolonged the stop.  Officer Brown testified in his affidavit that he engaged Cardenas in conversation while writing out the citation in an attempt to decrease Cardenas's level of nervousness.  Doc. 14, ¶ 16.  Further, when Officer Brown completed the paperwork and asked Cardenas if he could ask a few more questions, he did so upon observing a number of clearly articulated indicators of possible criminal activity, including Cardenas' driving behavior, labored breathing, general nervousness, implausible travel story, use of a rental car, unemployment, and travel from a city known as a source location for drugs.  *Id.*, ¶ 6.  Under the totality of the circumstances, the Court cannot conclude that Officer Brown's continued questioning unreasonably prolonged the traffic stop in violation of the Fourth Amendment.

### b.    Unlawful Search.

Claimants' argument that Officer Brown engaged in an unlawful search is also not supported by the evidence.  Claimants argue that the search was "inextricably bound up" in Officer Brown's prior unlawful detention, making any evidence gained from it subject to suppression, but Claimants fail to show evidence of unlawful detention.  Claimants also point to the objection they raised in their answer to the government's complaint that Cardenas only told Officer Brown he could look inside the vehicle, not that he could search it.  Doc. 20 at 3-4, ¶ 1; *see* Doc. 11, ¶ 37.  But Claimants do not dispute the government's statement of fact that Officer Brown obtained consent (*see* Docs. 13, ¶ 38; 21-1 at 1); nor do they present any contrary evidence.  The affidavit of G. Cardenas states, instead, that Officer Brown "asked me if he could search my car and I agreed."  Doc. 20-2, ¶ 15.  Upon this evidence, the Court cannot conclude that the search was unlawful.

### 2.    Claimants' Evidence of Legitimate Business Activity.

Claimants have pointed to the Disclaimer that G. Cardenas signed, the promissory note, and documentation of a previous vehicle sale as evidence that the currency was not drug proceeds, but was connected to legitimate business activity.  Doc. 20 at 4, ¶ 3.

The Disclaimer, as previously noted, simply contains Cardenas's unsupported

assertion that he is the owner of the currency based on "buying and selling cars." Doc. 17 at 2. Claimants also point to the statements of their attorney in a fax cover sheet to the FBI stating that Cardenas purchased a vehicle in Arizona for $3,000 and sold it to Ken Fowler for $7,500. *See* Doc. 17 at 4. This assertion is supported, in part, by the affidavit of USMS Senior Inspector Dennis Harkins stating his findings that the California Department of Motor Vehicles has a record of the sale of a used Toyota from Cardenas to Ken Fowler Motors on August 12, 2011, but that the sale price is not included in the record. Doc. 17 at 9-10, ¶¶ 4-6. There is no record of the prior purchase of this vehicle occurring in Arizona, as Cardenas claims, or that the vehicle was ever registered here. *Id.*, ¶¶ 4-6. Claimants also do not provide evidence of any other vehicle sales to support Cardenas's claim that he bought and sold approximately three vehicles for profit while trying to determine if he should go into business and apply for a California seller's license. Doc. 20-2 at 4, ¶ 4. Nor do they provide any evidence of L. Cardenas's source of funding for making an $80,000 loan to his son.[3]

The Court concludes that a reasonable jury could not find on the basis of this evidence that it was more likely than not that Cardenas was carrying $105,180 in currency for legitimate, non-drug-related reasons. Cardenas has provided little evidence to support that $80,000 of this amount came from his father in the form of a loan, other than a personal promissory note notarized after the currency was seized. Claimants' assertion that the rest of the money – over $25,000 – came from Cardenas's personal savings also lacks credible support and is implausible in light of the fact that Cardenas produced no documentation of his earnings during the nearly two years he worked for Ken Fowler Motors. He also has produced no proof of employment between his layoff in March of 2011 and September 16, 2011, more than six months later, when the currency

---

[3] Claimants state that they provided evidence to the government substantiating the property transactions that served as the source for this loan, but they have pointed to no facts concerning such transactions in the record.

1  was seized and he told Officer Brown he was unemployed.  With the exception of the

2  sale of one used vehicle to Ken Fowler Motors, for which Claimants have provided no

3  proof of purchase or sales price, Cardenas's assertions that he made profits through car

4  sales after he was laid off are also unsupported and implausible, as is the story that he

5  would take the entire $105,130 in cash on a trip to Albuquerque, New Mexico, to

6  investigate and purchase used cars for possible resale in Ukiah, California.  Claimants

7  have provided no evidence that Cardenas looked at or attempted to purchase used cars

8  during his trip to Albuquerque.  Finally, the assertion that $80,000 of the currency came

9  from a legitimate business loan and the rest from savings, even if plausible, does not

10  explain the packaging of the currency, Cardenas's concealment of it, his contradictory

11  explanations, or why the money would have been contaminated with the odor of

12  controlled substances.   In summary, Cardenas' assertions that he was carrying the

13  currency for legitimate business purposes is implausible and unsupported on the record.

14      **D.    Conclusion.**

15      The government has carried its burden of showing by a preponderance of the

16  evidence that there is a substantial connection between the money seized and illegal drug

17  activity.  18 U.S.C. § 983(c)(3).  Claimants have failed to present evidence that raises a

18  genuine issue of material fact for trial.  As already noted, to defeat summary judgment,

19  Claimants must present evidence sufficient for a reasonable jury to return a verdict in

20  their favor.  *Anderson*, 477 U.S. at 248.  Claimants have failed to do so, and the

21  government is therefore entitled to summary judgment.

22      **IT IS ORDERED:**

23      1.    The government's motion for entry of judgment pursuant to Rule 56(e)

24           (Doc. 18) is **denied**.

25      2.    The government's motion for summary judgment (Doc. 12) is **granted**.

26

27

28

3.      The Clerk is directed to issue a judgment in this matter.

Dated this 17th day of May, 2013.

_____
David G. Campbell
United States District Judge